**BANES HOREY BERMAN & MILLER, LLC**
**201 Marianas Business Plaza**
**1 Nauru Loop, Susupe, Saipan, CNMI**
**Mail: P.O. Box 501969 Saipan MP 96950**
**Phone: 234-5684        Fax: 234-5683**
**E-mail: jhorey@pacificlawyers.law**

**Attorneys for Plaintiffs**

### IN THE DISTRICT COURT
### FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ANDREW SABLAN SALAS, | ) **Case No. 1:22-cv-0008** |
| | ) |
| Plaintiff, | ) |
| | ) **OPPOSITION TO** |
| v. | ) **MOTION TO DISMISS** |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) **Date: October 13, 2022** |
| Defendant. | ) **Time: 10:00 a.m.** |
| | ) |
| | ) |

### <u>INTRODUCTION</u>

By this action, Plaintiff seeks a declaration that the recent act of Congress prohibiting cockfighting in the last areas under U.S. jurisdiction where it remained legal under local law is without lawful force in the CNMI. *See generally* Complaint for Declaratory and Injunctive Relief (ECF No. 1). Defendant United States has now moved to dismiss the Complaint. *See generally* Defendant's Motion to Dismiss (ECF No. 3) (hereinafter Motion). Defendant's arguments are unavailing for the reasons set out herein.

Respectfully submitted this eighth day of September, 2022.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Plaintiff


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

# TABLE OF CONTENTS

I.   INTRODUCTION   1

II.  SCOPE OF ACTION   1

III. STATUTORY HISTORY   2

A.  A Limited Federal Cockfighting Prohibition Is Enacted in 1976   2

IV. ARGUMENT   4

A.  The Cockfight Prohibition Does Not Apply to the CNMI via Section 502   4

   1.  The 1976 Cockfight Prohibition Did Not Apply to Guam,
There Its Amendments Do Not Apply to the CNMI   5

   2.  The 1976 Cockfight Prohibition Was Not Of General Applicability to
The Several States, Therefore Its Amendments Do Not Apply
to the CNMI   10

B.  The Cockfight Prohibition Does Not Apply to the CNMI via Section 105   12

C.  The Covenant Should Be Construed Consistently With Its Purpose   15

D.  The Law Breaches the Covenant's Guarantee of Self-Government   17

V.  CONCLUSION   21

# TABLE OF AUTHORITIES

**US-NMI Covenant**

Section 103   21

Section 105   12, 13, 14

Section 502   *passim*

Section 503   1

Section 504   12

Section 1003   4

**US Constitution**

Art. I, § 8, cl. 3 (Commerce Clause)                          14

Art. IV, § 3, cl. 2 (Territorial Clause)                     14

**Statutes**

7 U.S.C. §§ 2131-59                                           3

7 U.S.C. § 2155                                              3

7 U.S.C. § 2156                                         *passim*

7 U.S.C. §§ 2157-59                                          3

7 U.S.C. § 2160                                              3

18 U.S.C. § 1651                                            6-7

28 U.S.C. § 2409a                                          8. 9

33 U.S.C. § 701h-1                                           13

42 U.S.C. §§ 1382-1383f                                      7

48 U.S.C. § 1421a                                            5

48 U.S.C. § 1801                                             7

22 G.C.A. § 39110                                            5

22 G.C.A. §§ 39101-18                                        5

**Public Laws**

U.S. Pub. L. 89-544 (January 10, 1966), 80 Stat. 350-53      2

U.S. Pub. L. 91-579 (December 24, 1970), 84 Stat. 1560       3

U.S. Pub. L. 92-562 (October 25, 1972), 86 Stat. 1176        8

U.S. Pub. L. 94–279 (April 22, 1976), 90 Stat 417          3. 5

U.S. Pub. L. 96-487 (Dec. 2, 1980), 94 Stat. 2371           6

U.S. Pub. L. 99–598 (November 4, 1986), 100 Stat 3351                    8, 9

U.S. Pub. L. 107–171 (May 13, 2002), 116 Stat. 134                      11

U.S. Pub. L. 109–163 (January 6, 2006), 119 Stat 3136                   13

U.S. Pub. L. 115-334 (December 20, 2018), 132 Stat. 5015, § 12616       *passim*

Guam Pub. L. 01-034 (1951)                                             5

Guam Pub. L. 03-023 (1955)                                             5

**Legislative History**

Congressional Record (May 18, 2018)                                    17-21

Hearing of Subcommittee on Territorial and Insular Affairs,
House of Representatives, "To Approve 'The Covenant to Establish the
Commonwealth of the Northern Mariana Islands" and for Other Purposes,"
94th Cong., 1st Sess. (July 14, 1975)                             7

S. Rep. 94-433, 94th Cong., 1st Sess. (October 2, 1975)           7

Marianas Political Status Commission, *Section-by-Section Analysis of the
Covenant to Establish a Commonwealth of the Northern Mariana Islands*    9, 16

**Cases**

Boyle v. Anderson, 68 F.3d 1093 (8th Cir. 1995)                     10

Club Gallistico de Puerto Rico Inc. v. United States,
414 F. Supp. 3d 191 (D.P.R. 2019)                                     14

Commonwealth of the Northern Mariana Islands v. Atalig,
723 F.2d 682 (9th Cir. 1984)                                        13

Commonwealth of the Northern Mariana Islands v. United States,
670 F.Supp.2d 65 (D.D.C. 2009)                                        17

County of Wayne v. Hathcock, 684 N.W.2d 765 (Mich. 2004)             6

Eche v. Holder, 742 F.Supp.2d 1136 (D.N.M.I. 2010)                    6, 15

Estate of Rangamar, 4 N.M.I. 72 (1993)                               20

Hernandez-Gotay v. United States, 985 F.3d 71 (1st Cir. 2021)      14

_In re Great Plains Royalty Corp.,_ 471 F.2d 1261 (8th Cir. 1973)          10

_In re Griggs,_ 965 F.2d 54 (6th Cir. 1992)          10

_Lake County v. Rollins,_ 130 U.S. 662 (1889)          6

_League of Women Voters of Michigan v. Secretary of State,_
975 N.W.2d 840 (Mich. 2022)          6

_Linsangan v. United States,_ 2021 WL 6103047 (9th Cir. 2021)          14

_Northern Mariana Islands v. United States,_ 279 F.3d 1070 (9th Cir. 2002)          8, 9

_Parents for Privacy v. Barr,_ 949 F.3d 1210 (9th Cir. 2020)          10

_Ratzlaf v. United States,_ 510 U.S. 135 (1994)          8

_Saipan Stevedore Co. Inc. v. Director, Office of Workers' Comp. Programs,_
133 F.3d 717 (9th Cir. 1998)          12

_United States ex rel. Richards v. Deleon Guerrero,_ 4 F.3d 749 (9th Cir. 1993)          4, 12, 17

_United States v. Classic,_ 313 U.S. 299 (1941)          16

_United States v. Lawson,_ 677 F.3d 629 (4th Cir. 2012)          16

_Wabol v. Villacrusis,_ 958 F.2d 1450 (9th Cir. 1990)          13

_United States v. Vaello Madero,_ __ U.S. __, 142 S. Ct. 1539 (2022)          7

**Other**

Presidential Proclamation No. 4534, 42 Fed. Reg. 56593 (October 24, 1977)          4

U.N. Gen. Assembly Res. No. 742, A/RES/742(VIII) (1953)          20

U.N. Gen. Assembly Res. No. 1541, A/RES/1541(XV) (1960)          20

U.N. Declaration on the Rights of Indigenous Peoples, A/RES/61/295 (2007)          20

U.N. Gen. Assembly Res. No. 2621, A/RES/2621(XXV) (1970)          21

NMI Commission on Federal Laws, Second Interim Report          12

NMI Commission on Federal Laws, Final Report          12

## Books

Robert F. Rogers, DESTINY'S LANDFALL: A HISTORY OF GUAM (1995)                    19

Don A. Farrell, HISTORY OF THE NORTHERN MARIANA ISLANDS (1991)              19

Hermann H.L.W. Costenoble, THE MARIANAS (1905)                                        19

NEW WEBSTER'S DICTIONARY                                                                         10

ROGET'S THESAURUS                                                                                       10

## Articles

Simon Romero, "Bastion of Cockfighting Is Under Pressure to Ban It,"
New York Times (December 9, 2004)                                                                  15

NBC News, "La. finally quits cockfights, last state to ban it" (August 11, 2008)     15

Clifford Geertz, Deep Play: Notes on the Balinese Cockfight (1972)                     18

Janet M. Davis, "Cockfight Nationalism: Blood Sport and the Moral Politics of
American Empire and Nation Building,"
American Quarterly (September 2013)                                                              19

*220908-PL-M to dismiss-tables*

**BANES HOREY BERMAN & MILLER, LLC**
**201 Marianas Business Plaza**
**1 Nauru Loop, Susupe, Saipan, CNMI**
**Mail: P.O. Box 501969 Saipan MP 96950**
**Phone: 234-5684      Fax: 234-5683**
**E-mail: jhorey@pacificlawyers.law**

**Attorneys for Plaintiffs**

**IN THE DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **ANDREW SABLAN SALAS,** | ) **Case No. 1:22-cv-0008** |
| | ) |
| **Plaintiff,** | ) |
| | ) **OPPOSITION TO** |
| **v.** | ) **MOTION TO DISMISS** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) **Date: October 13, 2022** |
| **Defendant.** | ) **Time: 10:00 a.m.** |
| | ) |
| _____ | ) |

**I.  INTRODUCTION**

By this action, Plaintiff seeks a declaration that the recent act of Congress prohibiting cockfighting in the last areas under U.S. jurisdiction where it remained legal under local law is without lawful force in the CNMI.  *See generally* Complaint for Declaratory and Injunctive Relief (ECF No. 1).  Defendant United States has now moved to dismiss the Complaint.  *See generally* Defendant's Motion to Dismiss (ECF No. 3) (hereinafter Motion).  Defendant's arguments are unavailing for the reasons set out herein.

**II.  SCOPE OF ACTION**

Before proceeding further, Plaintiff wishes to make clear just what law it is that he is seeking to have declared inapplicable.  It is any prohibition in the laws of the United States against cockfighting as it has historically been practiced in the CNMI.  *Cf.* COVENANT § 503(b) ("any prohibition in the laws of the United States against foreign vessels landing fish or

unfinished fish products in the United States" not applicable to NMI).  Such a prohibition, in his understanding, was accomplished by Section 12616 of U.S. Public Law 115-334, the Agriculture Improvement Act of 2018 (hereinafter AIA § 12616), which had the effect of amending § 26(a), and striking § 26(d), of the Animal Welfare Act, both of which were codified at 7 U.S.C. § 2156. However, Plaintiff attacks those acts, and those sections, only to the extent that they effect a federal cockfight prohibition in the CNMI.  He is, for example, certainly not attacking the entire Agriculture Improvement Act, which deals with a wide variety of farm-related matters, the vast majority of which have nothing whatsoever to do with cockfighting.  Nor is he attacking the entire Animal Welfare Act, which is codified at 7 U.S.C. §§ 2131-59.  That Act deals primarily with animals used in scientific research, again not with cockfighting.  He is attacking AIA § 12616, and its immediate result, the present 7 U.S.C. § 2156(a), which do directly prohibit cockfighting.  If any other provision of law would prohibit cockfighting as is has historically been practiced in the CNMI, then he is attacking it as well, to the extent the logic of his argument applies with equal force to it.

### III.  STATUTORY HISTORY

### A.  A Limited Federal Cockfighting Prohibition Is Enacted in 1976.

The general federal cockfight ban appears at 7 U.S.C. 2156(a), which provides:

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture.

This appears in the Animal Welfare Act, the forerunner of which was an untitled 24-section bill enacted by Congress in 1966.  *See* U.S. Pub. L. 89-544 (January 10, 1966), 80 Stat. 350-53.  The twenty-four sections of this act were codified as 7 U.S.C. §§ 2131-54.  However, that original act contained nothing about cockfighting, and nothing corresponding to today's 7 U.S.C. § 2156.  Indeed, it contained nothing about birds of any kind, defining "animal" as "dogs, cats,

monkeys, guinea pigs, hamsters, and rabbits." *See id.* at § 2(h) (parenthetical omitted).   A subsequent act, the Animal Welfare Act of 1970, U.S. Pub. L. 91-579, then made various amendments to the original 1966 act, and added a new twenty-fifth section, which became 7 U.S.C. § 2155 (since repealed), requiring annual reports to Congress by the Secretary of Agriculture.   Again, however, it contained nothing about fighting, nothing about birds, and nothing corresponding to today's 7 U.S.C. § 2156.   *See* U.S. Pub. L. 91-579 (December 24, 1970) at § 22, 84 Stat. 1560, 1565.

The earliest version of 7 U.S.C. § 2156 finally appeared in the Animal Welfare Act Amendments of 1976, U.S. Pub. L. 94–279 (April 22, 1976), 90 Stat 417.  This act added a new twenty-sixth section to the 1966 Act, *see id.* at § 17 (§ 26), and belatedly bestowed the name "Animal Welfare Act" on the entire twenty-six sections.  *See id.* at § 2 (§ 1(a)).[1]  The new twenty-sixth section addressed "animal fighting ventures."  "Animal" was defined, for purposes of this section only, as "any live bird, or any live dog or other mammal, except man."  *Id.* at § 17 (§ 26(g)(5)).  Subsection (a) of the new section provided as follows:

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce.

---

[1]     Sections 27, 28 and 29 were then added to the Animal Welfare Act by subsequent legislation, and appear as 7 U.S.C. §§ 2157-59.  From 1976 to 2018, the term "Animal Welfare Act" was synonymous with Chapter 54 of Title 7.  However, one additional section was added to Chapter 54 in 2018, prohibiting the slaughter of dogs or cats for human consumption, but for some reason this was not designated as a section of the Animal Welfare Act.  *See* 7 U.S.C. § 2160.

*Id.* at § 17 (§ 26(a)).  Subsections (b) and (c) then prohibited other conduct tangentially related to animal fights.[2]  However, none of these provisions prohibited the conduct at issue on an across-the-board basis.  Their limited scope was set out in subsection (d), which stated:

> Notwithstanding the provisions of subsections (a), (b), or (c) of this section, the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds *only if* the fight is to take place in a State where it would be in violation of the laws thereof.

*Id.* at (§ 26(d)) (emphasis added).  In other words, where cockfights were concerned, the federal prohibition applied *only* to fights in states where such fights were already unlawful under state law.  It did not apply in states where they were lawful.  Such was the state of the law on January 9, 1978, when Section 502 of the Covenant went into effect.[3]

## IV.  ARGUMENT

### A.  The Cockfight Prohibition Does Not Apply to the CNMI Via Section 502.

From that point, Section 502 governed the application of this law to the CNMI.  *See United States ex rel. Richards v. Deleon Guerrero*, 4 F.3d 749, 756 (9th Cir. 1993) ("Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978[.]").  Section 502 provides in pertinent part as follows:

> The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:
> . . .
> those laws . . . which are applicable to Guam and which are of general application

---

[2]      *See id.* at § 17 (§ 26(b)&(c)) (prohibiting transporting an animal for fighting purposes, and using the mails to promote an animal fight).

[3]      *See* COVENANT § 1003(b) ("Section[] . . . 502 . . . will become effective on a date to be determined and proclaimed by the President of the United States which will be not more than 180 days after this Covenant and the Constitution of the Northern Mariana Islands have both been approved[.]"); Presidential Proclamation No. 4534, 42 Fed. Reg. 56593 (October 24, 1977) (setting January 9, 1978, as the effective date of COVENANT § 502).

to the several States as they are applicable to the several states[.]

COVENANT § 502(a)(2).  The cockfight prohibition, as it then stood, did not fit the terms of this

formula, and therefore did not apply to the CNMI.

### 1. The 1976 Cockfight Prohibition Did Not Apply to Guam, Therefore Its Amendments Do Not Apply to the CNMI.

To begin with, it was not applicable to Guam.  Cockfighting was prohibited under the act

"only if the fight is to take place in a State where it would be in violation of the laws thereof,"

U.S. Pub. L. 94–279 at § 17 (§ 26(d)).  The term "State" defined to include "any territory or

possession of the United States[.]"  *Id.* at § 17 (§ 26(g)(4)).  The term therefore included Guam.

*See* 48 U.S.C. § 1421a ("Guam is declared to be an unincorporated territory of the United

States.").  However, cockfighting was not in violation of the laws of Guam.  *See*, *e.g.,* 22 G.C.A.

§ 39110(a) ("Cockfights may be held on Sundays, legal holidays or church holidays.").  *See*

*generally id*. at §§ 39101-18 (Guam statutes regulating cockfighting).[4]  The prohibition therefore

did not apply to cockfights there.

The United States appears to argue that the prohibition was nevertheless, in some

Platonic sense, still "the law within Guam" – that it was the law that it was not the law, or that it

applied in that it did not apply.  *See* Motion at 13 ("Though the Animal Welfare Act did not ban

cockfighting in every state or territory, due to the fact that those entities did not themselves

prohibit the activity, its provisions were nevertheless the law within every state and territory

(including Guam) and therefore 'applicable to' the several states under the Covenant[.]").  This is

sophistry.  Any document having legal force should be construed, first and foremost, in

---

[4]      These Guam laws and their predecessors have been in effect since at least the 1950's, therefore since prior to January 9, 1978. *See* Guam Pub. L. 01-034 (1951) and Guam Pub. L. 03-023 (1955) (copies attached as Exhibit 1)

accordance with its ordinary, commonly understood, plain meaning.  *See, e.g.*, <u>Eche v. Holder</u>, 742 F.Supp.2d 1136, 1144 (D.N.M.I. 2010), *aff'd*, 694 F.3d 1026 (9th Cir. 2012) ("To determine congressional intent, the Court begins with statutory language's plain meaning. . . .To determine plain meaning, the Court gives words their ordinary, contemporary, common meaning.") (citations and internal quotation marks omitted).  This is especially true of a document like the Covenant, which owes its legal force to popular ratification.[5]  The plain meaning of "apply" is to have some practical effect, and a law imposing a ban that bans nothing in a given place has no more practical effect in that place than a law that is never enacted in the first place.  To say a cockfight ban was "applicable within" Guam in 1978 is akin to saying that the law creating the Arctic National Wildlife Refuge (U.S. Pub. L. 96-487, 94 Stat. 2371 (Dec. 2, 1980), § 303(2)(A)) was "applicable within" Florida, or that a law prohibiting piracy on the high seas (*see, e.g.*, 18

---

[5]     *See, e.g.,* <u>Lake County v. Rollins</u>, 130 U.S. 662, 671 (1889) ("The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.").

This rule of "common understanding" has been described by Justice Cooley in this way:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.  For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.

<u>County of Wayne v. Hathcock</u>, 684 N.W.2d 765, 779 (Mich. 2004) (*quoting* Cooley, CONSTITUTIONAL LIMITATIONS at 81).  *See also, e.g.*, <u>League of Women Voters of Michigan v. Secretary of State</u>, 975 N.W.2d 840, 873 (Mich. 2022) ("The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.  The lodestar principle is that of 'common understanding,' the sense of the words used that would have been most obvious to those who voted to adopt the constitution.") (footnotes and internal quotation marks omitted).

U.S.C. § 1651) is "applicable within" Nebraska.

The Covenant framers themselves spoke in this kind of plain language.  For example, Covenant § 502(a)(1), addresses Title XVI of the Social Security Act (42 U.S.C. §§ 1382-1383f), which provides for Supplemental Security Income (SSI). "To be eligible for Supplemental Security Income, an individual must be a 'resident of the United States,' which the statute defines as the 50 States and the District of Columbia." United States v. Vaello Madero, __ U.S. __, 142 S. Ct. 1539, 1542 (2022) (citations omitted) (citing 42 U.S.C. § 1382c(a)(1)(B)(i) & (e)).  This was understood by the parties negotiating the Covenant to mean that Title XVI was "not applicable to Guam."[6]

Similarly, the Covenant provided that certain laws "will not apply to the Northern Mariana Islands," Covenant § 502(c) (emphasis added), including "the immigration and naturalization laws," "the coastwise laws," and "the minimum wage provisions of Section 6, Act of June 25, 1938, Stat. 1062, as amended."  Id. at § 502(c)(1)-(3).  It used the word "apply" here in its ordinary sense of having a practical effect, not in any metaphysical sense of being, abstractly, "the law," albeit locally ineffectual.  In interpreting the Covenant, the word "apply" (and its various grammatical forms, such as "application" and "applicable") should be construed

---

[6] *See, e.g.*, Senate's Section-by-Section Analysis of the Covenant, in S. Rep. 94-433, 94th Cong., 1st Sess. (October 2, 1975), at 76-77 ("Title XVI of the Social Security Act which applies to all the States will not [*sic*] apply to the Northern Mariana Islands, *although it is not applicable to Guam*.") (emphasis added); Administration's Section-by-Section Analysis of the Covenant, in Hearing of Subcommittee on Territorial and Insular Affairs, House of Representatives, "To Approve 'The Covenant to Establish the Commonwealth of the Northern Mariana Islands" and for Other Purposes," 94th Cong., 1st Sess. (July 14, 1975), at 388-89 ("Title XVI of the Social Security Act which applies to all the States will apply to the Northern Mariana Islands, *although it is not applicable to Guam*.") (emphasis added).

The pages referenced are attached as Exhibits 2 and 3 hereto. The House document is the same excerpted by the Government as Exhibit A to its motion.  Both documents appear in full on Westlaw in "PL 94-241 LH," in "Legislative History Materials," under the "History" tab for 48 U.S.C. § 1801.

in this same common-sense way wherever it appears.  *See. e.g.,* <u>Ratzlaf v. United States</u>, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").  The cockfight prohibition of 7 U.S.C. § 2156(a) was "not applicable" to Guam in 1978, in this common-sense way, just as the SSI laws were "not applicable" there, and just as the immigration laws were not applicable to the CNMI before 2008, or the federal minimum wage laws before 2007.

The United States claims its metaphysical reading of the Covenant is supported by <u>Northern Mariana Islands v. United States</u>, 279 F.3d 1070 (9th Cir. 2002), but it misreads that case.  <u>NMI v. US</u> reached its holding on considerably more straightforward grounds. In that case, the question was whether the Commonwealth's action to quiet title to certain submerged offshore lands was barred by the statute of limitations.  The Quiet Title Act, as originally enacted in 1972, had imposed a twelve-year limitations period on such actions.  *See* U.S. Pub. L. 92-562 (October 25, 1972), 86 Stat. 1176, at § 3(a) (§ 2409a(f)) ("Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued.").[7]  The Act had later been amended, however, in 1986 – *after* January 9, 1978 – to exclude States from the statutory cut-off by adding the words "except for an action brought by a State."  *See* U.S. Pub. L. 99–598 (November 4, 1986), 100 Stat 3351, at § 4.  As amended, therefore, the statute provided in 2002, as it does today, that: "Any civil action under this section, *except for an action brought by a State*, shall be barred unless it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g) (emphasis added).

---

[7]     A "civil action under this section" was a quiet title actions against the United States, which were authorized by an earlier subsection of the same act.  *See* U.S. Pub. L. 92-562 (October 25, 1972), 86 Stat. 1176, at § 3(a) (§ 2409a(a)) ("The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest[.]") (*codified at* 28 U.S.C. § 2409a(a)).

In <u>NMI v. US</u>, the United States argued that this 1986 amendment to the Quiet Title Act did not apply to the CNMI under the formula of COVENANT § 502(a)(2), since it was not "applicable to Guam." The Ninth Circuit rejected this argument. Although the Court's opinion contains some opaque language of the type that tends to encourage metaphysical readings, particularly the impenetrable distinction it attempted to draw between "applicable with respect to" and "applicable within,"[8] the key to its holding was its finding that:

> Because the 1986 amendments became part of the Quiet Title Act [28 U.S.C. § 2409a], which itself is applicable within Guam, the Quiet Title Act's amendments are also applicable within Guam.

<u>NMI v. US</u>, *supra*, 279 F.3d at 1073 (internal quotation marks omitted). In other words, an amendment to an applicable law is itself applicable. This holding tracks the Covenant's formula for applicability – to wit, laws that are both applicable to Guam and generally applicable to the several States on January 9, 1978, "*and subsequent amendments to such laws*," will apply to the CNMI. COVENANT § 502(a). The Court's holding, therefore, basically followed this logical path:

- U.S. Pub. L. 99–598 § 3(a) amended 28 U.S.C. § 2409a(g) (the statute of limitations for quiet title actions against the United States).

- On January 9, 1978, 28 U.S.C. § 2409a(g) (then § 2409a(f)) was applicable to Guam (*i.e.*, it limited actions by Guam to a 12-year period).

- U.S. Pub. L. 99–598 § 3(a) therefore applied to the Northern Mariana Islands.

Applying that same approach to the instant case, however, yields the opposite result, as follows:

---

[8] These phrases appear several times in the negotiating history of the Covenant, sometimes as two separate things, as here, but also, more clearly, in the *Analysis of the Covenant* by the Micronesian Political Status Commission, as a single thing. *See* ECF No. 3-1 at 23 ("The phrases used throughout Subsection (a) 'applicable to Guam' or 'applicable to the Trust Territory of the Pacific Islands' are used in the sense of 'applicable within or with respect to' the geographic areas mentioned or the people who reside in or who are citizens of those geographic areas.").

- AIA § 12616 amended 7 U.S.C. § 2156(a) (the federal cockfight ban).

- On January 9, 1978, 7 U.S.C. § 2156(a) was *not* applicable to Guam (*i.e.*, it did not ban cockfights there).

- AIA § 12616 therefore did *not* apply to the Northern Mariana Islands.

*2.  The 1976 Cockfight Prohibition Was Not of General Applicability to the Several States, Therefore Its Amendments Do Not Apply to the CNMI.*

At any rate, however one interprets the phrase "applicable to Guam," that is only one of the two necessary conditions imposed by COVENANT § 502 for a pre-1978 law to apply in the CNMI.  The other is that the law must have been, on January 9, 1978, "of general application to the several States[.]"  COVENANT § 502(a)(2).  Not just "application," but "*general* application." The Covenant's use of the word "general" here adds an additional requirement that is not present with respect to its application to Guam.  "General" means "pertaining to a whole class or order . . . embracing the whole, not local or partial." NEW WEBSTER'S DICTIONARY.  Synonyms include "to a man," "one and all," and "without exception." ROGET'S THESAURUS (No. 78).  "General application," as repeatedly interpreted by the courts, means *equal and uniform* application. *See, e.g.*, Parents for Privacy v. Barr, 949 F.3d 1210, 1235 (9th Cir. 2020) ("[T]he question of general applicability addresses whether a law treats religious observers unequally."); Boyle v. Anderson, 68 F.3d 1093, 1101 (8th Cir. 1995) ("'[T]he Court must determine whether the statute is 'of general application.'  A law of general applicability is one that does not treat ERISA plans differently from non-ERISA plans."); In re Griggs, 965 F.2d 54, 58 (6th Cir. 1992) ("Because section 186A.197(1) applies uniformly, not only in bankruptcy cases, it is a generally applicable law under § 546(b)"); In re Great Plains Royalty Corp., 471 F.2d 1261, 1264 (8th Cir. 1973) (a company's policy distinguishing between the death of an individual and the dissolution of a corporation violates "the bylaw requirement that such refunds be administered according to

'policies of general application.'").  Indeed, the Covenant's use of the word "several" reinforces this effect.  "Several" means "and each of them," as in the phrase "joint and several liability." "General application to the several States" therefore, means "uniformly applicable to the States, and each of them."

On January 9, 1978, the cockfight ban imposed by 7 U.S.C. § 2156(a) was not generally applicable to the several States.   On the contrary, as provided in 7 U.S.C. § 2156(d), it distinguished sharply among the states, treating them entirely differently depending on whether cockfighting was or was not already prohibited by their own laws.  Indeed, for many years, the subsection imposing the distinction was expressly titled "SPECIAL RULE FOR CERTAIN STATES."[9]  Even if it was, in some sense, "applicable" to all the States, therefore, it was not *generally* applicable to them.  7 U.S.C. § 2156(a) therefore does not meet the second prong of COVENANT § 502(a)(2), and was not thereby made applicable to the Northern Mariana Islands.

---

[9]     In 2002, the provision making the cockfight ban dependent on state law was relocated from 7 U.S.C. § 2156(d) to a new paragraph of 7 U.S.C. § 2156(a), so that the full subsection (a) read as follows:

(a) Sponsoring or Exhibiting an Animal in an Animal Fighting Venture —

(1) In General – Except as provided in paragraph (2), it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, if any animal in the venture was moved in interstate or foreign commerce.

(2) Special Rule for Certain States – With respect to fighting ventures involving live birds in a State where it would not be in violation of the law, it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.

*See* U.S. Pub. L. 107–171, Farm Security and Rural Investment Act of 2002 (May 13, 2002), 116 Stat. 134, at § 10302(a) (capitalization of headings omitted).  Paragraph (2) became Paragraph (3) after another amendment in 2014, but did not change in substance until it was eliminated entirely by AIA § 12616 in 2018.

Finally, in arguing that 7 U.S.C. § 2156 became applicable through COVENANT § 502(a)(2), the United States relies on the Second Interim Report of the NMI Commission on Federal Laws. *See* Motion at 14. However, there are at least four problems with this argument. First, the passage cited does not discuss 7 U.S.C. § 2156, or any part of Title 7, Chapter 54 (the Animal Welfare Act), at all, except in the vaguest terms as one of dozens of "remaining chapters in Title 7," after Chapter 12. Second, the Commission was an advisory board tasked with recommending what laws "should" apply, not framers deciding what laws *do* apply. *See* COVENANT § 504. Third, even if the Commission did consider 7 U.S.C. § 2156 at the time (1985), it would have discovered the 1976 version of the law, which exempted jurisdictions – like the CNMI – where local law allowed cockfighting. Fourth, the Second Interim Report is just that – an *interim* report. The Commission's Final Report eschewed the Interim Report's law-by-law approach in favor of "a more general rule by which the application of federal law can be judged in the future." *See* Final Report of Commission on Federal Laws, attached as Exhibit 5. The Final Report has also been relied on by the Ninth Circuit. *See* Saipan Stevedore Co. Inc. v. Director, Office of Workers' Comp. Programs, 133 F.3d 717, 725 (9th Cir. 1998).

### B.  The Cockfight Prohibition Does Not Apply to the CNMI Via Section 105.

Plaintiff submits that the applicability of AIA § 12616 to the CNMI is properly evaluated under the formula of COVENANT § 502(a)(2), because it was a "subsequent amendment" of a law "in existence" on January 9, 1978, namely 7 U.S.C. § 2156(a). However, if it is viewed as a new law enacted in 2018, perhaps because it imposed new legal burdens in places where they had not previously existed, its applicability would be evaluated under COVENANT § 105. *See* United States ex rel. Richards v. De Leon Guerrero, 4 F.3d 749, 756 (9th Cir. 1993) ("Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978, and . . .

Section 105 governs the application of federal laws enacted after that date.").   Section 105 provides as follows:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

COVENANT § 105.  It is clear from the face of AIA § 12616 that the CNMI is not "specifically named" anywhere in it.  *See* 7 U.S.C. § 2156(f)(3) ("[T]he term 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States[.]").[10]  The United States contends, however, that the "specific

---

[10]    In fact, it is not clear that it is named even generically.  As the United States notes, the statutory term "territories" has sometimes been construed as including the CNMI, but the Ninth Circuit has also been recognized that the CNMI may not be properly termed a "territory" at all. *See, e.g.*, <u>Commonwealth of the Northern Mariana Islands v. Atalig</u>, 723 F.2d 682, 691 & fn. 28 (9th Cir. 1984) (not deciding, but finding merit to, the argument that "the NMI should be treated as neither an incorporated nor an unincorporated territory"); <u>Wabol v. Villacrusis</u>, 958 F.2d 1450, 1460 fn. 18 (9th Cir. 1990) ("It is undisputed that the Commonwealth is not an incorporated territory, though the precise status of the Commonwealth is far from clear.").

Furthermore, in modern statutory definitions, "territories" and "commonwealths" are often listed separately or distinguished, indicating that even Congress does not, or at least does not always, regard these as the same thing.  Here, for example, "the Commonwealth of Puerto Rico" is listed distinctly from "any territory" (not, significantly, any "other" territory) – as distinctly as is "any State."  *See also, e.g.*, 33 U.S.C. § 701h-1 ("For purposes of this section, the term 'State' means the several States, the District of Columbia, commonwealths, territories, and possessions of the United States, and Indian tribes[.]"); U.S. Pub. L. 109–163, 119 Stat 3136 (January 6, 2006), at §1057(a)(5) ("The following sections are amended by striking 'Territories, Commonwealths, or possessions' each place it appears and inserting 'Commonwealths or possessions' . . .").  This is ultimately irrelevant, of course, as the Covenant requires the CNMI to be named *specifically*.  General reference to "territories" are not sufficient even if the Commonwealth is considered a "territory."  Indeed, even a general reference to "Commonwealths" would not meet the terms of COVENANT § 105.

13

naming" requirement of COVENANT § 105 applies only to laws enacted pursuant to Congress'

powers under the Territorial Clause (U.S. CONST., art. IV, § 3, cl. 2), and that AIA § 12616 was

"not an exercise of Congress's powers under the Territorial Clause." Motion at 16. This latter

assertion, however, is directly contrary to the holding of the Ninth Circuit. Linsangan v. United

States, 2021 WL 6103047 at *1 fn.1 (9th Cir. 2021) ("Because Section 12616 was a valid

exercise of Congress's powers under the Territorial Clause, we need not reach the issue whether

it is valid under the Commerce Clause.").[11] Indeed, it was specifically intended to apply to "the

territories," and was expressly titled: "EXTENDING PROHIBITION ON ANIMAL FIGHTING

TO THE TERRITORIES." U.S. Pub. L. 115-334 (December 20, 2018), 132 Stat. 5015, at §

12616.

Even if the United States is correct that AIA § 12616 could also be applied to the States

via the Commerce Clause (See U.S. CONST., art. I, § 8, cl. 3 ("The Congress shall have Power . .

. [t]o regulate Commerce . . . among the several States[.]"), there is no basis for its assumption

that the Covenant's language, "cannot also be made applicable to the several States," means only

"cannot constitutionally." Plaintiff submits that, consistently with the above, "cannot" should be

construed, in accordance with its common and ordinary usage, as meaning not just "cannot as a

matter of constitutional law," but also "cannot as a matter of practical reality." By the time AIA

§ 12616 was enacted in 2018, cockfighting was illegal, by state law, in all fifty states. The first

---

[11]     The District Court of Puerto Rico also found the Act valid under the Territorial Clause.
Club Gallistico de Puerto Rico Inc. v. United States, 414 F. Supp. 3d 191, 208 (D.P.R. 2019).
On appeal, the First Circuit did not reach the issue. See Hernandez-Gotay v. United States, 985
F.3d 71, 80 fn. 7 (1st Cir. 2021) ("As the Commerce Clause power is sufficient, we need not
reach the Territorial Clause issue.").

state to prohibit it was Massachusetts, in 1836, and the last was Louisiana, in 2008.[12]   As such, it was also prohibited by 7 U.S.C. § 2156(a) in all fifty states, since 7 U.S.C. § 2156(a) allowed it in only those states where it did not violate state law.  AIA § 12616 therefore could not, and did not, affect the law in any state.

### C.  The Covenant Should Be Construed Consistently With Its Purpose.

It will be noted that much of the disagreement between the Parties as to the construction of the Covenant turns on the construction of such terms as "law," "apply," "generally," and "cannot."  Certainly constructions of these terms can be found – and no doubt will be found by able counsel for the United States – that, if stretched far enough, would support a federal cockfight ban in the CNMI.  However, the very ordinariness of these words is all the more reason to avoid stretching them and adhere to their ordinary meanings.  To the extent a genuine ambiguity exists, however, it should be resolved in such a way as to advance the purpose of the Covenant.  This principle of construction, like the plain meaning rule, is applicable to any legal instrument.  *See, e.g.*, <u>Eche</u>, *supra*, 742 F.Supp.2d at 1144 ("If the statutory language is ambiguous, the Court examines the language in its statutory context, looking to the language of the entire statute, its structure, and purpose.") (internal quotation marks omitted).  Like that rule, it also has special force for instruments requiring popular ratification:

> For in setting up an enduring framework of government [the Framers of the United States Constitution] undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing

---

[12]   Simon Romero, "Bastion of Cockfighting Is Under Pressure to Ban It," <u>New York Times</u> (December 9, 2004) (https://www.nytimes.com/2004/12/09/us/bastion-of-cockfighting-is-under-pressure-to-ban-it.html), NBC News, "La. finally quits cockfights, last state to ban it" (August 11, 2008) (https://www.nbcnews.com/id/wbna26123404).

course of events, but as the revelation of the great purposes which were intended
to be achieved by the Constitution as a continuing instrument of government. If
we remember that 'it is a Constitution we are expounding,' we cannot rightly
prefer, of the possible meanings of its words, that which will defeat rather than
effectuate the constitutional purpose.

United States v. Classic, 313 U.S. 299, 316 (1941) (quoting M'Culloch v. Maryland, 17 U.S. (18

Wheat.) 316, 407 (1819)).   The purpose of the Covenant, as evidenced by its history and

structure, was to establish self-government in the CNMI by treating the Commonwealth as if it

were a state, except in unusual circumstances when the reason for the disparate treatment would

be specifically considered and purposeful, or, conversely, when doing so would itself violate

self-government.   This purpose is particularly evident in two-prong formula of COVENANT §

502(A)(2), which applies existing laws to the CNMI "as they are applicable to the several states"

– *not* as they are applicable to Guam, or to the territories generally.   This distinction was

deliberate. The formula was:

> intended to prevent the application of laws so as to reach intraterritorial matters
> within the Northern Mariana Islands where similar intrastate matters within the
> states are not reached.   To reach matters in the Northern Marianas would be
> inconsistent with the guarantee of local self-government contained in the
> Covenant.   This Subsection also removes all doubt by assuring that certain very
> old "territorial" laws passed by the United States would not apply to the Northern
> Marianas.   These also would have been inconsistent with local self-government.

Marianas Political Status Commission, *Section-by-Section Analysis of the Covenant to Establish

a Covenant to Establish a Commonwealth of the Northern Mariana Islands*, ECF No. 3-1 at 23-

24. The effect of the United States' reading is to apply the law to the CNMI as a territory.   The

states, by contrast, were all afforded the right to decide in their own time if and whether to

prohibit cockfighting.   They did so on their own terms and by their own free choice.   Due care

for the principles of federalism were built into the law and respected.   *See, e.g.*, United States v.

Lawson, 677 F.3d 629, 638 (4th Cir. 2012) ("[T]he disparate treatment [of jurisdictions in pre-

2018 7 CMC § 2156(a)] was occasioned by the decision of Congress to accommodate principles of federalism.").  Only after all the states were out of the picture did Congress decide it would now abandon federalism, take matters into its own hand and dictate unilaterally to the territories how things would be.  *See* Congressional Record (May 18, 2018) (copy attached as Exhibit 5) at H4221 (Rep. Roskam: "It is against the law in . . . all 50 states, and what *we* are proposing is to make that a standard in the territories as well.") (emphasis added).

### D.  The Law Breaches the Covenant's Guarantee of Local Self-Government.

Even if a law applies to the CNMI through one of the Covenant's formulae, it is still inapplicable if it infringes on the guarantee of self-government, and it does so unless the federal interest involved outweighs the extent of intrusion into local self-government.  *See* U.S. ex rel. Richards v. De Leon Guerrero, 4 F.3d 749, 755 (9th Cir. 1993) ("[W]e think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI.").  Contrary to the United States' claim, *see* Motion at 18, there is no requirement that the balancing test be applied only in cases of "purely internal affairs."  On the contrary, it is best suited to cases involving both local and federal interests; otherwise, there is nothing to balance.  It has been applied in such cases, including Richards itself, and, most momentously, Commonwealth of the Northern Mariana Islands v. United States, 670 F.Supp.2d 65, 87 (D.D.C. 2009), the Commonwealth's challenge to the federalization of immigration.

In those case, the federal interest at stake was concrete and substantial.  *See* Richards, *supra*, 4 F.3d at 755 ("millions of dollars" in federal assistance); NMI v. US, 670 F.Supp.2d at 87-89 (foreign affairs and national security). In this case, by contrast, the federal interest is purely moral.  That was abundantly clear from the hearing in the House of Representatives on

what would become AIA § 12616.  Rep. Roskam of Illinois opened debate by stating, "Animal fighting is inappropriate and wrong wherever it happens."  Exhibit 5 at H4221.  Two different congressmen described cockfighting as "barbaric" – Rep.  Blumenhauer of Oregon, and Rep. Knight of California, who called it "this barbaric activity which has no place in modern society." *Id*. at H4222.  To the extent that the congressmen were concerned with anything beyond that, it was simply uniformity for its own sake – *see id*. at H4222 (Rep. Blumenhauer: "We should have no separate rules for States, territories, or anywhere under our jurisdiction") – a concern which is not only does not weigh in the law's favor, but weighs positively against it, being antithetical to the whole concept of local self-government.[13]

The local interests are both cultural and political.  At the hearing, three territorial delegates spoke in opposition to the bill, including Delegate Bordallo of Guam, who stated: "[C]ockfighting is a culturally significant practice in many of our islands."  Exhibit 4 at H4222. Similarly, Delegate Plaskett of the Virgin Islands stated: "This is a highly regulated, cultural and historic activity in the territories."  *Id*.  The manner and extent to which this is true is a factual question better suited to a motion for summary judgment than this motion to dismiss. Nevertheless, and whatever one may think of cockfighting, it is undeniably one part of the cultural and social milieu in the societies where it is practiced.  It was, for example, the subject of a classic analysis by anthropologist Clifford Geertz, <u>Deep Play: Notes on the Balinese Cockfight</u> (1972), attached as Exhibit 6.  It has often become politically controversial as cultural values clash, sometimes even within one society.  *See id*. at 57 (noting "the pretensions to puritanism radical nationalism tends to bring with it").  Sometimes, however, the clash comes

---

[13]  The United States' reliance on legislative history asserting federal interests in prior versions of 7 U.S.C. § 2156, *see* Motion at 18-19, is unavailing.  Those interests were asserted in support of a law that, by its own terms, did not extend to the CNMI or the territories.  Therefore, they cannot logically be seen as justifying a law whose very purpose is to extend it there.

from external sources.  Its suppression by American authorities in territories acquired in the Spanish-American War, and the resulting political backlash, is detailed in Janet M. Davis, "Cockfight Nationalism: Blood Sport and the Moral Politics of American Empire and Nation Building," American Quarterly (September 2013), attached as Exhibit 7.  Davis does not discuss the Marianas, but it is clear that much the same thing was occurring on Guam at the same time, where the first American governor, Richard Leary, issued an order in 1900 which "forbade cockfighting, the main sport on Guam and dearly beloved by the men of the island."  Robert F. Rogers, Destiny's Landfall: A History of Guam (1995) (excerpts attached as Exhibit 8) at 122.[14] This was not an isolated order, moreover, but part of a sustained pattern to "change local customs," which included the suppression of Catholic religious processions (Order No. 4), "living together out of the bounds of wedlock" (Order No. 5), and appearing "nude" in public (directed to the Carolinian village of Maria Cristina) (Order No. 21).  Id. at 119-22.[15]

In debate, the bill's sponsor discounted the cultural nature of the issue:

> I am sorry, this Congress has rejected the notion that this is culturally specific.  Animal cruelty has no place in any territory, in any State, by any race or ethnic group or cultural tradition.  We have gone past that.

Exhibit 5 at H4222 (statement of Rep.  Blumenhauer).  This disregard of the cultural issue, however, brings the political side of the local interest into focus, in that those delegates who

---

[14]    Indeed, a French captain visiting Guam as early as 1772 had described Chamorro men as "passionately fond of cockfighting."  Id. at 84.

[15]    Meanwhile, on Saipan, German Governor Georg Fritz was "more sensitive to indigenous customs[.]"  Id. at 120.  According to Governor Fritz's own account, "[c]ockfights were held on Sunday afternoons and holidays.  The cockpit was just a roped-off area, and a defeated bird often ran away.  The losing bird became dinner for the winner's master."  Don A. Farrell, History of the Northern Mariana Islands (1991) at 277 (citing Georg Fritz, Die Chamorro) (1904) (excerpt attached as Exhibit 9).  Another German settler of the time wrote: "Everyone has to be back in the village on Sunday to watch the cockfights, popular since Spanish times."  Hermann H.L.W. Costenoble, The Marianas (1905) at 54 (excerpt attached as Exhibit 10).

thought it actually *was* a cultural issue were denied a vote on its passage, even though their constituents were the only people actually affected by it.  Not surprisingly, they made this point at the hearing.  *See* Exhibit 5 at H4222 (Del. Plaskett: "[A]ll of the territories' Delegates are against this amendment."); *id.* (Del. Bordallo: "Are you aware that we are denied the right of a vote against this amendment on this House floor?").  This denial of a vote to their representatives on a matter directly concerning them was direct evidence of the territories' people's lack of self-government.

For most of the territories, this is only par for the course, for they are still acknowledged by the United States, and listed by the United Nations, as *non*-self-governing territories.  The CNMI, however, is supposed to be different.  It is supposed to have achieved self-government already, through the Covenant.  And one significant factor is determining if self-government exists in a given territory is the "degree of autonomy in respect of economic, social and cultural affairs, as illustrated by . . . the degree of freedom and lack of discrimination against the indigenous population of the Territory in social legislation[.]"  U.N. Gen. Assembly Res. No. 742, A/RES/742(VIII) (1953). *See also* U.N. Gen. Assembly Res. No. 1541, A/RES/1541(XV) (1960) (self-government should "respect[] the individuality and cultural characteristics of the territory and its peoples"); U.N. Declaration on the Rights of Indigenous Peoples, A/RES/61/295 (2007) at Art. 5 ("Indigenous peoples have the right to maintain and strengthen their distinct political, legal, economic, social and cultural institutions[.]"); *id.* at Art. 11(1) ("Indigenous peoples have the right to practice and revitalize their cultural traditions and customs.").  It is true that "custom over time may gradually change[,]" Estate of Rangamar, 4 N.M.I. 72, 77 (1993), and change itself is inherently a part of any culture.  But self-government assures that such change will come only when the people themselves decide they are ready for it, and will not be

forced upon them by distant power brokers who deem themselves morally superior.  If that cannot occur in the halls of Congress, it must occur through the Covenant that guarantees self-government to the NMI people.  *See* COVENANT § 103.

## **CONCLUSION**

At the hearing on AIA § 12616, Rep. Roskam, one of its sponsors, stated, "We know what this activity is." Exhibit 5 at H4222.  Indeed we do.  It is naked colonialism of the most Victorian kind, and "[w]e ought not be complicit in it." *Id.*[16]  For the foregoing reasons set forth above, but especially for that reason, the United States' motion to dismiss the complaint in this matter should be denied.

Respectfully submitted this eighth day of September, 2022.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Plaintiff


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey


*220908-PL-M to dismiss-OPP 6*

---

[16]   *See* U.N. Gen. Assembly Res. No. 2621, A/RES/2621(XXV) (1970) ("[T]he further continuation of colonialism in all its forms and manifestations [is] a crime which constitutes a violation of the Charter of the United Nations . . . and the principles of international law.").